**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH GERHART,** *et al*                                                                    **PLAINTIFFS**

**vs.**                                                              **CIVIL ACTION NO.: 3:11-CV-586-HTW-LRA**

**RANKIN COUNTY,** *et al.*                                                          **DEFENDANTS**

<u>**ORDER GRANTING IN PART AND DENYING IN PART
McCLENDON'S MOTION FOR SUMMARY JUDGMENT**</u>

BEFORE THIS COURT is a Motion for Summary Judgment **[Docket no. 173]** filed by the Defendant Brad McClendon. In his motion, McClendon asks this court to grant him summary judgment on all claims against him. The plaintiffs, Joseph Gerhart (individually and as next friend of Sarah Robillard and Ian Gerhart), Amanda Jo Gerhart (individually and as next friend of Sarah Robillard and Ian Gerhart), and Brett Gerhart, have filed a response in opposition along with a brief in opposition. [Docket nos. 196 and 197].

The Fourth Amended Complaint alleges: 42 U.S.C. § 1983[1] claims against all the defendants for violations of the Fourth[2], Fifth[3], and Fourteenth[4] Amendments for unreasonable search and excessive force; failure to train and supervise against Rankin County, Mississippi; the Rankin County Sherriff's Office; former Rankin County Sherriff Ronnie Pennington; the City of Pearl, Mississippi; the Pearl Police Department; and former City of Pearl Police Department, Chief Ben Schuler; civil conspiracy against all defendants; reckless infliction of emotional distress against all defendants; and negligent infliction of emotional distress against all defendants. [Docket no. 206].

On October 21, 2016, this court held a Telephonic Conference with all parties. After oral arguments from the parties on October 21, 2016, this court reserved ruling on said motions until its continued hearing in Courtroom 6A of the United States District Courthouse, Jackson, Mississippi, held on October 24, 2016. A court reporter transcribed both hearings, including the

---

[1] Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C.S. § 1983.

[2] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

[3] No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. Amend. V.

[4] Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, Sec. 1.

bench rulings issued by this court on October 24, 2016.  This court hereby adopts the transcripts of those conversations as a part of this order.  The transcripts will reflect this court's review of the relevant case law and facts upon which this court relied in announcing its opinion during the October 24, 2016, hearing.

After a careful study of the submissions of the parties, the arguments of counsel, and the relevant jurisprudence, this court finds McLendon's Motion for Motion for Summary Judgment **[Docket no. 173]** GRANTED in part and DENIED in part for the reasons set out *infra*.

## I.       STATEMENT OF FACTS

*A.       The Participants*

Detective Jamie Scouten (hereinafter referred to as "Scouten") is an adult resident of Rankin County, Mississippi. Scouten was employed with the City of Pearl Police Department (hereinafter referred to as "Pearl PD") and had been employed as a law enforcement officer with the City of Pearl since 2007. [Docket no. 174-1, P. 6].

Officer John Barnes (hereinafter referred to as "Barnes") is an adult resident of Rankin County, Mississippi. Barnes was employed with the Pearl PD as a K-9 law enforcement officer at the time of the incident. [Docket no. 174-6, PP. 5-6].

Deputy Brett McAlpin (hereinafter referred to as "McAlpin") is an adult resident of Rankin County, Mississippi. McAlpin was employed by the Rankin County Sheriff's Department (hereinafter referred to as "Rankin County"). McAlpin has been employed as a sheriff's deputy since 2001. [Docket no. 174-4, PP. 9-10].

Agent Brad McClendon (hereinafter referred to as "McClendon") was employed with the Mississippi Bureau of Narcotics (hereinafter referred to as "MBN") at the time of the alleged

incident. McClendon had been employed with MBN as a law enforcement agent for three (3) years at the time of the alleged incident. [Docket no. 174-3, PP. 6-7].

Brett Gerhart (hereinafter referred to as "Brett") is an adult resident of Rankin County, Mississippi. Brett lived at 481 Robert Michael Drive, Pearl, Mississippi at the time of the alleged incident with the rest of the plaintiffs.

Joseph Gerhart (hereinafter referred to as "Joseph") is an adult resident of Rankin County, Mississippi. Joseph lived at 481 Robert Michael Drive, Pearl, Mississippi at the time of the alleged incident with the rest of the plaintiffs.

Amanda Jo Gerhart (hereinafter referred to as "Amanda") is an adult resident of Rankin County, Mississippi. Amanda lived at 481 Robert Michael Drive, Pearl, Mississippi at the time of the alleged incident with the rest of the plaintiffs.

Ian Gerhart (hereinafter referred to as "Ian") is a minor resident of Rankin County, Mississippi. Ian lived at 481 Robert Michael Drive, Pearl, Mississippi at the time of the alleged incident with the rest of the plaintiffs.

Sarah Robillard (hereinafter referred to as "Sarah") is a minor resident of Rankin County, Mississippi. Sarah lived at 481 Robert Michael Drive, Pearl, Mississippi at the time of the alleged incident with the rest of the plaintiffs.

B.    *Background*

Agent Scouten was aware of the Fourth Amendment proscription against entering a residence without a warrant, absent exigent circumstances. [Docket no. 174-1, PP. 8-9, LL 19-10]. Detective Scouten had prepared search warrants for the target residence at 473 Robert Michael Drive, Pearl, MS before the buy-bust operation. [Docket no. 174-1, P.10, L. 7-15]. Barnes was not aware of a search warrant. [Docket no. 174-3, P. 8, L. 17-22].

The Pearl PD had been working a case at the target residence for several months before June 7th, 2010. [Docket no. 174-1, P.12, L. 8-11]. As part of their investigation, the Pearl PD had been using a "professional" confidential informant (hereinafter referred to as "CI") who was paid every time she successfully obtained evidence. [Docket no. 174-1, P. 12, L. 12-15; and P. 13, L. 1-6]. On the day of the incident in question, the CI was carrying a purse which had both audio and video recording equipment to record the CI buy. [Docket no. 174-1, PP. 13-14, LL. 14-8]. The audio and video recordings captured conversations which occurred after the buy-bust at the target residence. [Docket no. 174-1, P. 17, L. 2-15].

Prior to June 7th, Pearl PD was the only agency involved. [Docket no. 174-1, P. 20, L. 15-18]. Scouten decided to ask for assistance from Rankin County, and the Rankin County District Attorney's Office (hereinafter referred to as "Rankin County DA"), based on the DEA's interest in the target of the investigation. [Docket no. 174-1, PP. 0-21, LL. 19-5]. Farris Thompson (hereinafter referred to as "Thompson"), who worked for both the DEA and the Rankin County DA, asked Scouten to conduct one more buy bust to 'freshen-up' the probable cause. [Docket no. 174-1, PP. 23-24, LL. 6-11]. Scouten didn't ask MBN agents McClendon and Cochran to join in the buy-bust, they just happened to be at the Pearl PD station with McAlpin. [Docket no. 174-1, P. 35, L. 1-7].

C.    Briefing

Scouten conducted a briefing at the Pearl PD on June 7, and he listed all the people in his report who were present. [Docket no. 174-1, P. 38, L. 17-20]. During that briefing, Scouten told law enforcement agents who were participating that 473 Robert Michael Drive was the target address. [Docket no. 174-1, PP. 38-39, LL. 21-4]. The CI was also present and drew a diagram of the target residence's interior in the presence of McAlpin, McClendon, and Barnes. [Docket no.

174-1, P. 39, L. 5-21]. Before the CI drew the diagram, Scouten wrote "473 Robert Michael Drive" at the top of the blank sheet of paper. [Docket no. 174-1, P. 41, L. 10-21].

During the briefing, McClendon was standing in the doorway and Barnes was left of Scouten leaning against a cabinet. [Docket no. 174-1, PP. 42-43, LL. 19-3]. McClendon claims he was not present at the briefing and that he never saw the diagram drawn by the CI at the briefing. [Docket no. 174-3, PP. 27-28, LL. 18-1 and P. 39, L. 8-14]. The location of McAlpin during the briefing is unknown to Scouten. [Docket no. 174-1, P. 42, L. 16-18].

McClendon did not know various information which was crucial: what color the target residence was; what color the CI's vehicle was; where the residence was located; or what the target residence's address was. [Docket no. 174-3, PP. 29-31]. Further, McClendon allegedly was not aware of who the CI was. [Docket no. 174-3, PP. 25-26, LL. 20-3].

McAlpin testified he was present at the briefing but was standing in the hallway because of the size of the space. [Docket no. 174-5, P. 175, L. 14-15 and P. 178, L. 12-22]. McAlpin also testified he never talked with the CI, was never told the address, and never given a description of the target residence, rather, the information was given by the CI to someone else and relayed to him. [Docket no. 174-5, PP. 67-68, and Docket no. 174-5, P. 73, L. 2-10]. McAlpin does remember from the briefing that the buy-bust was to take place on Robert Michael Drive, but alleges he was given no specifics about the residence. [Docket no. 174-5, PP. 177-178].

Barnes testified he, McAlpin, and McClendon were present at the briefing and he recalled the CI from the briefing. [Docket no. 174-6, P. 8, L. 15-17, and P. 10, L. 3-7]. The briefing was held in the Pearl PD Narcotics office. [Docket no. 174-6, P.9]. During the briefing, the CI drew a diagram of the interior of the residence. [Docket no. 174-6, P. 12].

During the briefing, law enforcement officers and the CI discussed "the location, persons involved, the narcotics being purchased, the informant, the identity of the informant so they knew who they were – who the informant was compared to the suspects when they made entrances, to please be careful with her." Docket no. 174-1, [P. 44, L. 12-18]. Scouten used Google Earth images to further demonstrate the location of the target residence by showing the target residence, the neighborhood, and the catholic church where the team was supposed to gather. [Docket no. 174-1, PP. 84-85, 87-88, LL. 4-3, 22-11]. Scouten also mentioned an unusual van with a dualie axle in the driveway of the target residence, which the officers joked about at the briefing. [Docket no. 174-1, P. 116, L. 12-19].

At the briefing, Barnes, McAlpin, and McClendon were assigned to maintain a position at the end of Robert Michael Drive, maintain visual contact with 473 Robert Michael Drive, make sure the suspect did not leave, and track the movement of the CI to and from the target residence. [Docket no. 174-1, P. 90, 15-22; PP. 99-100, LL. 16-2; and Docket no. 174-6, PP. 21-22]. None of the law enforcement agents at the catholic church could see the target residence. [Docket no. 174-1, P. 101, L. 2-6]. McAlpin was also required to carry the breaching equipment to gain access to the target residence. [Docket no. 174-1, P. 90-91, L. 23-1].

Scouten made vehicle assignments to take into account the fact that not every law enforcement agency participating had access to the radio channels being used by Pearl PD. [Docket no. 174-1, P. 47, L. 2-8]. Barnes and McAlpin were assigned to the vehicle that McClendon drove. [Docket no. 174-3, P. 28, L. 15-21]. McAlpin asserted that McClendon drove his MBN black Cadillac Escalade, McAlpin sat in the front passenger seat, and Barnes was in the rear passenger seat behind McClendon. [Docket no. 174-5, P. 62, L. 14-25]. Barnes, though, testified he was

7

sitting behind McAlpin while they rode to Robert Michael Drive. [Docket no. 174-6, P. 19, L. 13-18].

D.     *Convoy to Residence and CI Buy*

The CI and law enforcement all left the Pearl PD at 1859 to go to the target residence or the catholic church as their assignments dictated. [Docket no. 174-1, PP. 103-104, LL. 25-4]. All the cars left the PD together with vehicle driven by McClendon following the CI to the target residence. [Docket no. 174-1, P. 26, L. 9-17]. The CI was driving a white Chevy Cobalt with Texas license plates which was owned by the Pearl PD. [Docket no. 174-1, P. 26-27, L. 18-3]. The CI was to be followed by the vehicle driven by McClendon and everyone else was to drive to the catholic church. [Docket no. 174-1, P. 6, L. 3-8]. McClendon testified he never followed the CI to the target residence. [Docket no. 174-3, PP. 31-32, LL. 23-4]. McAlpin testified he didn't remember following the CI vehicle to the target residence. [Docket no. 174-4, P. 63, L. 4-15]. Barnes testified McClendon followed the CI to the target residence. [Docket no. 174-6, P. 18].

As the CI pulled into the driveway at the target residence, McClendon had to slow his vehicle to avoid running into the vehicle driven by her. [Docket no. 174-1, P. 111, L. 1-11 and Docket no. 174-6, PP. 19-20, LL. 19-7]. Once the CI turned into the driveway, McClendon drove past the target residence, approximately 200 yards, turned around, and parked facing the residence. [Docket no. 174-1, P. 111, L. 14-17]. Brett noticed McClendon's vehicle parked on the corner of Pemberton Drive and Robert Michael Drive before the vehicle started to approach his residence. [Docket no. 174-7, PP. 24-25].

McAlpin testified Barnes and McClendon identified the Gerhart residence as the target residence. [Docket no. 174-4, P. 63, L. 14-21]. Later, McAlpin testified that only Barnes identified the target residence. [Docket no. 174-4, PP. 66-67, LL. 19-2]. McClendon allegedly noticed a

subject standing outside the residence as his vehicle passed the Gerhart residence and Barnes said, "that's the house." [Docket no. 174-3, P. 31, L. 13-22]. McClendon testified Barnes stated, "he's standing outside" as a way of identifying the target residence. [Docket no. 174-3, PP. 103-104, 105-106]. Barnes testified he identified the target residence and pointed out the van with the dualie axle and McClendon confirmed his identification of the target residence. [Docket no. 174-6, P. 20]. It was daylight, it wasn't raining, and the terrain between the target residence and the Gerhart residence was level. [Docket no. 174-1, PP. 162-163, LL. 22-8].

Once inside the residence, the CI bought $600 worth of methamphetamines individually packaged. [Docket no. 174-1, PP. 111-12, LL. 20-1]. The CI, then, sent a text message to Scouten indicating she was in danger. [Docket no. 174-1, P. 95, L. 2-22]. The plan for this eventuality was that all units were to converge on the residence quickly and do everything they could to render assistance to the CI. [Docket no. 174-1, P. 97, L. 5-8]. The target residence had burglar bars, so, the plan was to affect entry at the carport door entry to the interior of the target residence. [Docket no. 174-1, PP. 97-98, LL. 12-10]. The Gerhart residence has no burglar bars. [Docket no. 174-1, P. 98, L. 13-15].

E.    *Radio Difficulties*

Barnes turned off his radio after McClendon parked his vehicle on Robert Michael Drive to observe the residence. [Docket no. 174-6, P. 23, L. 6-11]. Barnes turned off his radio because McClendon was trying to use his radio to tune into the radio broadcast from the recording equipment worn by the CI. [Docket no. 174-6, P. 23, L. 16-24].

When the CI texted Scouten that she was in trouble, Scouten broadcasted over the Pearl PD radio channel that the CI was in danger. [Docket no. 174-1, P. 112, L. 12-15]. All law enforcement vehicles acknowledged the transmission and command to converge upon the target

residence to protect the CI, with the exception of McClendon's vehicle. [Docket no. 174-1, P. 112, L. 12-17]. Scouten then expressly requested an acknowledgement from McClendon's vehicle that he had received the prior transmission. [Docket no. 174-1, P. 112, L. 24-25]. Barnes replied he did not receive the prior transmission and Scouten repeated it. [Docket no. 174-1, PP. 112-13, LL. 25-6; and Docket no. 174-6, PP. 24-25, 29-30]. McClendon testified this exchange never happened. [Docket no. 174-3, PP. 44-45, LL. 19-2]. McAlpin testified he didn't know who called them over what radio, but knew a call had come in for them to move to the target residence. [Docket no. 174-5, P. 90, and 174-5, P. 165].

F.    *Converging on the Target and Gerhart Residences*

In response to the call, McClendon drove his vehicle, which was already running, toward the Gerhart residence. [Docket no. 174-6, PP. 30-31]. Brett Gerhart heard McClendon's vehicle's tires screech when McClendon started driving toward the Gerhart residence. [Docket no. 174-7, PP. 25-27]. Barnes stated he grabbed his rifle which was behind the driver's side seat, as he prepared to exit the vehicle. [Docket no. 174-6, P. 31]. No one could see the blue lights which indicated McClendon's vehicle was an undercover law enforcement vehicle unless the lights were turned on. [Docket no. 174-3, PP. 74-75]. Brett Gerhart next noticed the vehicle driven by McClendon as it was pulling into the yard at the Gerhart residence between some trees. [Docket no. 174-7, P. 28]. According to Brett, McClendon's blue lights were not turned on. [Docket no. 174-7, P. 29].

When Scouten's vehicle turned the corner around Robert Michael Drive, Scouten saw the vehicle driven by McClendon coming down the road. [Docket no. 174-1, P. 113, L. 22-24]. Upon exiting his vehicle at the target residence, he heard yelling from his left and saw McAlpin, McClendon, and Barnes running across the Gerhart yard yelling at someone, and then disappear

from view. [Docket no. 174-1, P. 114, L. 5-12]. Scouten went to the target residence, realized they

could not get in without breaching tools, and went to look for McAlpin. [Docket no. 174-1, P. 116,

L. 5-11]. When Scouten reached the front yard of the target residence, he saw McAlpin and

McClendon coming out of the Gerhart residence and noticed McAlpin walking with his head down

and appearing as if he was in distress. [Docket no. 174-1, P. 117, L. 9-20]. Then, Scouten heard

someone yell from the target residence that they had finally made entry and he left McAlpin to

return to the residence. [Docket no. 174-1, P. 118, L. 1-5].

G.     *Entry Into the Gerhart Residence*

When McClendon parked his vehicle in front of the Gerhart residence, McAlpin exited the

vehicle and drew his firearm. [Docket no. 174-5, PP. 91-92, LL. 20-14]. McAlpin did not carry

breaching tools. [Docket no. 174-5, P. 91, L. 13-20]. McAlpin, wearing an attack vest with

"Sheriff" on it and a badge, announced "Sheriff's Department, get on the ground." [Docket no.

174-5, P. 126]. All law enforcement officers involved in the operation were wearing vests which

were labeled as police or law enforcement. [Docket no. 174-3, P. 62]. Barnes likewise exited the

vehicle, fell, stood back up and heard someone shouting, "Police. Stop. Police." [Docket no. 174-

6, P. 32]. Brett saw people exiting McClendon's vehicle and heard someone shouting, "get the f...

down" but never heard anyone identifying themselves as law enforcement officers. [Docket no.

174-7, P. 30, 32]. Brett specifically remembers seeing guns emerging from the vehicle. [Docket

no. 174-7, PP. 36-37].

When McClendon's vehicle came to a stop, Brett started running toward the Gerhart

residence. [Docket no. 174-5, P.102-103 and 174-5, P. 187]. Brett turned and locked the carport

door after he was inside: McAlpin kicked the door in shortly thereafter. [Docket no. 174-5, PP.

104-106; Docket no. 174-7, PP. 33,34]. Brett ran through the kitchen, the dining room, living

room, and towards the front door. [Docket no. 174-7, P. 34]. While running through the residence, Brett was shouting, "they have guns." [Docket no. 174-7, P. 35]. He ran past his father, Joseph, who was running back into the kitchen from the dining room. [Docket no. 174-7, P. 35]. McAlpin chased Brett through the residence to the front door where he confronted him again. [Docket no. 174-5, PP. 106-108].

According to Brett, he ran through the front door to prevent any intruders from entering the residence. [Docket no. 174-7, P. 38]. McAlpin testified when he reached the front porch, Brett was already on the ground, face down, and denies hitting or kicking Brett [Docket no. 174-5, PP. 111-112]; however, McAlpin acknowledged he was pointing his weapon at Brett Gerhart's head. [Docket no. 174-5, PP. 143-144]. According to McAlpin, he grabbed Brett by his shirt and took him into the living room. [Docket no. 174-5, P. 144]. Brett testified that he turned around at the front door and McAlpin was already there. [Docket no. 174-7, P. 46]. According to Brett, McAlpin grabbed him, threw him to the ground, facedown, and yelled, "you don't run from me, motherf...er." [Docket no. 174-7, P. 46, 49]. When he had Brett on the ground, McAlpin allegedly kicked Brett multiple times in the side and back of the head. [Docket no. 174-7, PP. 51-53]. Brett suffered injuries to his lip and cheek allegedly as a result of being kicked by McAlpin. [Docket no. 174-7, PP. 53-56]. Brett stated McAlpin picked him up, brought him into the living room floor, and placed him on the ground on his stomach. [Docket no. 174-7, P. 61].

Barnes was the last officer to make entry into the Gerhart residence. [Docket no. 174-6, P. 37]. He saw McAlpin chasing Brett, noticed Joseph, and heard a woman screaming. [Docket no. 174-6, PP. 37, 40]. Shortly thereafter, he saw a woman, later identified as Amanda, exiting a door with a baby in her arms and she was in a fetal position. [Docket no. 174-6, P. 43]. Amanda testified she dropped to her knees only after Barnes trained his firearm on her. [Docket no. 169-11, P. 11].

Amanda was in a panicked state. [Docket no. 174-6, PP. 43-44]. Barnes asked the lady her name and she replied "Amanda Gerhart." [Docket no. 174-6, P. 44]. Barnes then asked the lady who was in the back room and she indicated another child of hers. [Docket no. 174-6, P. 44]. Barnes then realized they were in the wrong residence. [Docket no. 174-6, P. 44]. Amanda testified this exchange never took place, that Barnes never said a word to her. [Docket no. 169-11, P. 11]. Amanda retreated to the room of her son, Ian, and told him to call 911 and tell them there were men in the residence with guns. [Docket no. 169-11, P. 12]. A 911 call was actually made and the caller stated that people were within the Gerhart residence with guns. [Docket no. 174-1, P. 66, L. 1-13].

McClendon entered the residence and turned his attention to Joseph, training his weapon on Joseph. [Docket no. 174-3, PP. 57-58]. Joseph was on the floor at this time. [Docket no. 174-3, P. 58]. McClendon aimed his firearm at Joseph's face and told him to "get the f… down." [Docket no. 174-8, P. 47]. At which point McClendon put his hand on Joseph's back and kept telling him to stay down because Joseph was trying to get up to assist his son, Brett. [Docket no. 174-8, P. 47-48].

According to McAlpin, when Barnes told McAlpin they were in the wrong residence, McAlpin got off of Brett and left the residence. [Docket no. 174-5, PP. 117-120]. Brett testified Barnes had to pull McAlpin off of him after Barnes told McAlpin they were in the wrong residence. [Docket no. 174-7, P. 64]. Barnes testified it took two times to get McAlpin to hear him, at which point McAlpin let Brett up and left the Gerhart residence. [Docket no. 174-6, P. 46]. McAlpin said to Barnes, "well, I hope y'all have fun dealing with this." [Docket no. 174-5, P. 119, L. 16-19].

After leaving the Gerhart residence, McAlpin walked to the target residence by himself. [Docket no. 174-5, P. 156]. When he arrived at the target residence, McAlpin told Thompson what

had occurred at the Gerhart residence. [Docket no. 174-5, P. 157]. According to McClendon, he likewise left the Gerhart residence upon realizing they were at the wrong residence. [Docket no. 174-3, PP. 65-66]. Brett says he did not see the word "police" on any of the law enforcement officers' vests until they were leaving the residence. [Docket no. 174-7, P. 65].

H.     *After the Entry and Discovery of Wrong Residence*

After becoming aware of the entry into the Gerhart residence, Scouten sent Thompson to take "care of it" and contact the correct supervisors. [Docket no. 174-1, P. 61, L. 5-18]. Scouten also talked with McAlpin who told him, "this is bad, this is bad." [Docket no. 174-1, P.119, L. 3-10].

Barnes stayed at the residence with McClendon to calm Joseph down, apologize, and explain what happened. [Docket no. 174-6, P. 47; Docket no. 169-12, PP. 68-89]. Joseph was upset and Barnes interjected himself between Joseph and McAlpin but never put his hands on Joseph Gerhart. [Docket no. 174-6, P. 48; Docket no. 169-12, P. 67]. Barnes eventually contacted dispatch to have a supervisor sent to the Gerhart residence; Sergeant Sellers of the Pearl PD was sent as a result. [Docket no. 174-6, P. 54]. Barnes stayed at the Gerhart residence until the Pearl PD Chief of Police (hereinafter referred to as "Chief Schuler") arrived on scene and Barnes briefed the Chief on what had happened. [Docket no. 174-6, P. 56-57].

Someone contacted emergency medical teams and the Rankin County Fire Department to check on Brett Gerhart's injuries. (hereinafter referred to collectively as "EMT") [Docket no. 174-6, PP. 55, 57, 65]. Barnes saw injuries to Brett's face and neck but did not see how Brett Gerhart got injured. [Docket no. 174-6, P. 57, 65]. When EMT responded to the Gerhart residence, Brett complained of pain to the back of his neck and abrasions to the right cheek and his lip. [Docket no. 174-7, PP. 57-59].

Later, Barnes returned to the Gerhart residence to take pictures of the door and Brett's injuries. [Docket no. 174-6, P. 61]. During that visit, Joseph was complaining to Chief Schuler that his son had been hit by an officer and asked for McAlpin's name. [Docket no. 174-6, P. 62]. Brett had previously told his father an officer had kicked him in the head but does not know who told him it was McAlpin. [Docket no. 174-6, P. 73; Docket no. 174-7, P. 44].

After the alleged incident, Detective Lieutenant Ellis, Chief Investigator for the Criminal Investigation Division of the Pearl PD, assigned Sergeant Bennett to conduct an investigation of the incident at the Gerhart residence. [Docket no. 174-1, P. 29, L. 4-9]. Bennett's report indicates that inattentiveness on the part of the officers was the direct cause of the Gerhart incident. [Docket no. 174-1, P. 31, L. 12-18].

The City of Pearl Mississippi has already paid for the door that McAlpin kicked in on the Gerhart residence. [Docket no. 174-1, P. 158, L. 1-19].

## II.   JURISDICTION

The Plaintiffs have invoked the subject-matter jurisdiction of this court under Title 28 U.S.C. § 1331[5], often referred to as "federal question jurisdiction." Under federal question jurisdiction, this court has the power to exercise subject-matter jurisdiction over a lawsuit if a plaintiff alleges some claim or right arising under the United States Constitution or federal law. Because the Plaintiffs assert claims under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, this court is persuaded it possesses federal question subject-matter jurisdiction.

---

[5] The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C.A. § 1331 (West)

Further, this court finds it possesses supplemental jurisdiction, codified at Title 28 U.S.C. § 1367[6], to consider the state law claims that are closely related to the claims over which this court already possess federal question subject-matter jurisdiction. The state law claims asserted by the Plaintiffs against McClendon are civil conspiracy, and reckless infliction of emotional distress.

### III.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of identifying evidence that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether summary judgment is appropriate, the Court will look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *McDonald v. Entergy Operations Inc.*, 2005 WL 2474701, at *3 (S.D. Miss. Apr. 29, 2005) (*quoting* Fed. R. Civ. P. 56(c)).

The court must view the facts, evidence and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). "Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. It is improper for the district court to 'resolve factual disputes by weighing conflicting evidence . . . since it is the province of the jury to assess the probative value

---

[6] (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C.A. § 1367 (West)

16

of the evidence.'" McDonald, 2005 WL 2474701, at *3 (*quoting Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980)).

"A genuine dispute as to a material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rogers*, 755 F.3d at 350 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Summary judgment is also improper where the court merely believes it unlikely that the non-moving party will prevail at trial." *McDonald*, 2005 WL 2474701, at *3 (citing National Screen Serv. Corp. v. Poster Exchange, Inc., 305 F.2d 647, 651 (5th Cir. 1962)). "[C]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial." Id. (*citing TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir.2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1997). "Where factual disputes exist [in a summary judgment determination] asserting qualified immunity, [the court] accept[s] the plaintiffs' version of the facts as true." *Hunt v. Tomplait*, 301 Fed.Appx. 355, 359 (5th Cir. 2008).

## IV.   DISCUSSION

### A.  *Qualified Immunity*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). *See also Anderson v. Creighton*, 483 U.S. 635, 638 (1987). More specifically, the doctrine addresses the "concern that expansive civil liability for actions taken while on duty may cause police officers to hesitate before acting – a situation that could produce unwelcome results." *Sanchez v. Swyden*, 139 F.3d 464, 467-68 (5th Cir.1998) (citations omitted).

"The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority." *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir.1992)(citations omitted). Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *Id*. The plaintiff's burden of negating the defendant's qualified immunity defense is a heavy one. *See, e.g., Brown v. Lyford*, 243 F.3d 185, 190, n. 7 (5th Cir. 2001). "Abrogation of qualified immunity is properly the exception, not the rule." *Foster v. City of Lake Jackson*, 28 F.3d 425, 428 (5th Cir. 1994) (citation omitted).

Analysis of qualified immunity may be treated as a two-pronged inquiry. To determine whether a defendant is entitled to qualified immunity, a court must address the following questions: "(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Jennings v. Patton*, 644 F.3d 297, 300 & n .3 (5th Cir. 2011) (internal quotation marks and citation omitted).

If a court begins its analysis under the second prong, it must "consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007) (citation omitted). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.* (citations omitted); *see Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Moreover, "because qualified immunity turns only upon the objective reasonableness of the defendant's acts, a particular defendant's subjective state

of mind has no bearing on whether that defendant is entitled to qualified immunity." *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001)(citation omitted).

A defendant's conduct is "objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution[.]" *Id.* That is, "[i]f officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). The objective-reasonableness "standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (*quoting Malley v. Briggs*, 475 U.S. 335, 343 (1986)). This means that "even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity." *Glenn v. City of Tyler*, 242 F.3d 307, 312 -13 (5th Cir. 2001) (internal quotation marks and citation omitted).

A defendant's "conduct is . . . not objectively reasonable if it violates a clearly established right, because 'a reasonably competent public official should know the law governing his conduct.'" *Guillory v. Thomas*, 355 Fed. App'x 837, 840 (5th Cir. 2009) (*quoting Harlow*, 457 U.S. at 818-19). However, "an official does not lose qualified immunity merely because a certain right is clearly established in the abstract." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004). "It is clearly established that the government may not deny due process or inflict cruel and unusual punishments, for example, but those abstract rules give officials little practical guidance as to the legality of particular conduct." *Id.* Instead, the law must be "clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.'" *Id.* (*quoting Saucier*, 533 U.S. 194, 206 (2001).

"[T]here need not be commanding precedent that holds that the very action in question is unlawful; the unlawfulness need only be readily apparent from relevant precedent in sufficiently similar situations." *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (internal quotation marks and citation omitted)). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney*, 367 F.3d at 350 (*quoting Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

B.  *Constitutional Violation*

"The law of this Circuit states that '[w]arrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *Tomplait* at 359. (*quoting United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007); *see also Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

C.  *Reasonable Officer*

Law enforcement officers are generally granted qualified immunity where they make an honest mistake, which can only be "clearly established if the officers' conduct is 'consistent with a reasonable effort to ascertain and identify the place to be searched.'" *Tomplait* at 359. (*Citing Simmons v. City of Paris*, 378 F.3d 476, 479-480 (5th Cir. 2004); *quoting Maryland v. Garrison* 480 U.S. 79, 88, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)). "[T]o be clearly established 'does not mean that a court must have previously found the very action in question to be unlawful, but it does mean that 'in light of preexisting law the unlawfulness must be apparent'" *Hartsfield v. Lemacks*, 50 F.3d 950, 955 (11th Cir. 1995)(*citing Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir.

1994). "[W]e recognize 'the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants,' [the actions of law enforcement agents must be] 'consistent with a reasonable effort to ascertain and identify the place intended to be searched.'" *Hartsfield* at 955. *Quoting Maryland v. Garrison*, 480 U.S. 79, 88-89 (1987).

Taking the facts in a light most favorable to the non-moving party, this court finds the case of *Hunt v. Tomplait*, 301 Fed.Appx 355 (5th Cir. 2008), to be instructive. In *Tomplait*, members of the Houston, Texas, Police Department contacted members of the Jasper Police Department in Jasper, Texas, to request assistance in locating and arresting Edward Hunt, Jr., who allegedly had exchanged gunfire with Houston Police Officers before attempting to strike one of them with his vehicle. Hunt then fled the Houston area in a white El Camino with his cousin. After investigating Hunt's cousin, the suspected getaway driver, Houston Police Officers determined Hunt had fled to Jasper County, Texas. Houston Police Officers obtained a search warrant for 126 Circle Drive in Brookeland, Texas, the location to which Hunt allegedly had fled.

The Jasper Chief of Police, Todd Hunter, ordered one of his detectives to conduct initial surveillance of the Brookeland area to look for a white El Camino driven by a young African-American male. Hunter also requested Jasper County Deputy Paul Tomplait's assistance in locating "the Hunt residence." Tomplait briefed several members of the Jasper Police Department about a home located at 940 Church Street, Brookeland, Texas. Tomplait knew members of the Church Street residence because he had been there previously to arrest one of the occupants, Marcus Hunt. Tomplait assumed, wrongly, that the Church Street residence was the only Hunt residence in the Brookeland community. After the briefing, Tomplait, who had never seen the search warrant, led the search team to the Church Street residence and entered the residence by

21

breaking down the door. Inside, they found a husband and wife, whom they later determined not to be the suspect for whom they were searching and realized they had entered the wrong residence.

The *Tomplait* court found dispositive the fact that Tomplait never read the search warrant to ascertain whether they were at the right house. Relying on Ninth Circuit precedent, the court stated:

> The leaders of the expedition may not simply assume that the warrant authorizes the search and seizure. Rather, they must actually read the warrant and satisfy themselves that they understand its scope and limitations, and that it is not defective in some obvious way.

*Tomplait* at 360. *Quoting Ramirez-Butte Silver Bow County*, 298 F.3d 1022,1027 (9th Cir. 2002). Further, said the *Tomplait* court, there is no authority that officers acted reasonably where those law enforcement officers fail to "read the warrant or inquire about whether the address to which they were leading the search team was actually the address contained in the warrant." *Id.* at 361. "[R]eading the warrant is the most basic step an officer can take in ascertaining the place to be searched." *Id.* at 362. Thus, held the *Tomplait* court, the officers' actions were unreasonable and the officers were not entitled to qualified immunity.

This court also finds dispositive *Hartsfield v. Lemacks*, 50 F.3d 950 (11th Cir. 1995), on which the *Tomplait* court partially relied in reaching its decision. In *Hartsfield*, a case more factually on point with the instant lawsuit, officers had conducted an undercover narcotics buy operation. The lead officer, Michael Wayne Newton, then obtained a search warrant for the target residence, 5108 Middlebrooks Drive.  The next day, during daylight hours, Newton led the warrant team to 5128 Middlebrooks Drive, a residence at least two houses away from the target residence. The target house was located on the corner of a dead end street, while the residence law enforcement agents actually entered was further down the street. The Hartsfields' house had a

fence around it, while the target residence featured strewn-about junk cars, and no fence. The house numbers were clearly marked on both houses.

The *Hartsfield* court overturned the district court's granting of qualified immunity to law enforcement officers. The court found it dispositive that: the houses were clearly marked with numbers; the raid took place during daylight hours; the houses were on different parts of the street; the appearances of the houses were distinguishable; and the lead officer failed to read the warrant. *Id* at 955. Based on the facts the *Hartsfield* court found, it announced: "Newton's actions in this case were simply not 'consistent with a reasonable effort to ascertain and identify the place intended to be searched' as dictated by *Garrison*." *Id. (Quoting Maryland v. Garrison*, 480 U.S. 79, 88-89 (1987).

In the instant case, this court finds that the officers failed to read the warrant for themselves and that finding of fact is troubling. The law-enforcement operation in this matter was a large buy-bust which involved multiple law enforcement agencies. As the *Hartsfield* court, this court recognizes "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id*. Where officers are tasked with following a confidential informant (hereinafter referred to as "CI") to the target residence, observing that residence from the street, and entering to secure the CI in the event of a dangerous situation, they must pay attention to where the CI is going in the first place to avoid precisely what occurred in this case, the unconstitutional invasion of an innocent third party's residence.

This court finds multiple issues of disputed fact which, under this Circuit's precedent, must be taken in a light most favorable to the plaintiffs. McClendon should have known that to enter the home of an innocent was a clear constitutional violation. By failing to read the search warrant

McClendon did not even partake of the simplest precaution against his unconstitutional Fourth Amendment violation of the Gerhart residence. Furthermore, while the testimony of his brother law enforcement agents indicates that he was present at the briefing, his own statement belies that fact. Such a basic step should also have been taken to ensure the constitutionality of his actions, especially since he was designated to drive the breach team to the target residence.

This court finds the *Hartsfield* facts to be very similar to the case *sub judice*. The raid of the target residence occurred during daylight hours; the Gerhart residence was separated by one house from the target residence; the target residence had distinguishing features which the Gerhart residence did not, the dualie axle van, and the burglar bars; and the law enforcement agent responsible for transporting his brother law enforcement agents did not look at the warrant. More troubling for this court is the fact that McClendon insists he was not present at the briefing conducted by Scouten, even after hearing the testimony of other law enforcement agents which place him at the briefing. This court is convinced that McClendon's actions cannot be classified as an "honest mistake" which would afford him qualified immunity. McClendon cannot "clearly establish[] [that his] conduct [was] 'consistent with a reasonable effort to ascertain and identify the place to be searched.'" *Tomplait* at 359. (*Citing Simmons v. City of Paris*, 378 F.3d 476, 479-480 (5th Cir. 2004); *quoting Maryland v. Garrison* 480 U.S. 79, 88, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)). Thus, McClendon is not entitled to qualified immunity against the claims of unlawful entry for entering the Gerhart residence.

### D.  Remaining Claims

It is well established in this circuit that "[i]ssues [] that are inadequately briefed are considered abandoned." *Davis v. Davis* 826 F.3d 258, 266 (5th Cir. 2016)(citing *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).

In his motion for summary judgment, McClendon challenged the Plaintiffs' claims based in state law: civil conspiracy; negligent infliction of emotional distress; and reckless infliction of emotional distress. The Plaintiffs have failed to argue or brief these points of law with regard to McClendon, therefore, this court finds the Plaintiffs have abandoned their state law claims.

Furthermore, in his motion for summary judgment, McClendon challenged the Plaintiffs' claims for excessive force against him.  The Plaintiffs have failed to argue or brief this point of law, therefore, this court finds the Plaintiffs have abandoned their excessive force claim against McClendon.

### E.  CONCLUSION

This court has considered all of the submissions of the parties, and the relevant law, and is persuaded to GRANT IN PART and DENY IN PART the Motion for Summary Judgment **[Docket no. 173]** filed by the Defendant Brad McClendon. This court is persuaded that the McClendon is not entitled to qualified immunity for the unlawful entry claim against him. This court is further persuaded the Plaintiffs have abandoned all other claims against McClendon.

**SO ORDERED AND ADJUDGED this 31st day of March, 2017.**

**s/ HENRY T. WINGATE**
**UNITED STATES DISTRICT COURT JUDGE**

25