# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-60331
Summary Calendar

United States Court of Appeals
Fifth Circuit
**FILED**
October 25, 2017

Lyle W. Cayce
Clerk

JOSEPH GERHART, Individually, and next friend of Brett Michael Gerhart,
Ian Michael Gerhart, and Sarah Robillard, minors; AMANDA JO GERHART,
Individually, and next friend of Brett Michael Gerhart, Ian Michael Gerhart,
and Sarah Robillard, minors,

Plaintiffs - Appellees

v.

BRAD MCLENDON, in his official and individual capacity,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:11-CV-586

Before KING, ELROD, and HIGGINSON, Circuit Judges.
PER CURIAM:*

Defendant–Appellant Brad McLendon was one of a number of police
officers conducting a narcotics sting operation with a confidential informant.
When the confidential informant told officers that she was in danger, they
began to move to the property (at 473 Robert Michael Drive) where the sting

---

* Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5th Cir.
R. 47.5.4.

No. 17-60331

operation was to take place. McLendon and the other officers in his vehicle mistakenly targeted the house (at 481 Robert Michael Drive) where Joseph and Amanda Gerhart lived with their children, Brett and Ian, and their niece, Sarah Robillard. The Gerhart group sued, alleging violations of their Fourth, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983 and various state-law torts. The district court entered summary judgment in McLendon's favor on the state-law claims. However, it denied summary judgment as to the federal-law claims, concluding that McLendon was not entitled to qualified immunity. We AFFIRM.

## I.

By June 2010, Detective Jamie Scouten of the Pearl Police Department had spent several months investigating the residence at 473 Robert Michael Drive in Pearl, Mississippi.[1] As part of that investigation, Scouten used a confidential informant ("CI") to conduct "buy-bust" operations in which the informant would purchase methamphetamine at the residence. The U.S. Drug Enforcement Administration ("DEA") learned about Scouten's operation. It requested that he conduct another buy-bust operation in order to "freshen up" the probable cause for arrest and search warrants. Based on the DEA's interest, Scouten requested back-up from other law enforcement agencies, including Rankin County and the Rankin County District Attorney's Office. Prior to the operation, he prepared warrants and supporting affidavits for 473 Robert Michael Drive. The plan was for the CI to purchase methamphetamine and bring it to the officers, who would test it. Scouten would then fill in the salient details in the warrant and get a judge's approval.

---

[1] As we explain in Section II, we lack jurisdiction to review the district court's factual findings. We base our legal conclusions on the facts that the district court found sufficiently supported in the summary judgment record, *Gerhart v. Rankin Cnty.*, No. 3:11-CV-586, 2017 WL 1238028 (S.D. Miss. Mar. 31, 2017).

2

No. 17-60331

Brad McLendon had been an agent of the Mississippi Bureau of Narcotics for three years at the time of the operation. The district court found that Scouten never asked McLendon to join the operation. According to the district court, McLendon just happened to be at the Pearl Police Department station. McLendon testified that one of his superiors had asked him to go to Pearl that day to help with the operation.

The operation took place on June 7, 2010. Scouten held a briefing beforehand at the police station. During that briefing, Scouten told all of the officers participating that the target residence was 473 Robert Michael Drive. He then wrote "473 Robert Michael Drive" across the top of a sheet of paper and asked the CI to draw a diagram of the interior of the residence. Scouten and the CI also went over a number of other key details during that briefing, including the location, the persons involved, the type of narcotics, and the identity of the CI. This last piece of information was key because if the officers needed to enter the residence, it was important for the CI's safety that they could identify her. Scouten used Google Earth images to familiarize officers with the location and appearance of the target residence. Scouten also mentioned that an unusual van with a "dualie [sic] axle" was parked in the driveway of the target residence. Because the target residence had burglar bars around all windows, Scouten told the others that they would have to enter through a side door.[2]

There is a dispute over whether or not McLendon was present at that briefing. Scouten and several other officers claim that he was. McLendon insists that he was not there. Moreover, he claimed not to know key pieces of information. He did not know the location, color, or address of the target

---

[2] The Gerhart house did not have any burglar bars.

3

No. 17-60331

residence. He also did not know what the CI's vehicle looked like or even who she was.

Scouten divided the officers into several vehicles, making sure that at least one officer in each vehicle could access the Pearl Police Department's radio channels. McLendon was assigned to a vehicle with two other officers: Brett McAlpin of the Rankin County Sheriff's Department and John Barnes of the Pearl Police Department. Barnes, McAlpin, and McLendon were tasked with stationing themselves at the end of Robert Michael Drive, where they would maintain visual contact with the residence in order to track the CI and ensure that no suspects left. They were the only officers who could see the target residence. The others were parked out of sight at a nearby church.

The CI and the officers left the station around 7:00 p.m. The plan was for McLendon to follow the CI to the residence. McLendon insisted that he did not follow the CI to the target residence, though others testified that he did. Barnes and Scouten, for instance, both testified that McLendon had to brake as the CI turned into the driveway of the target residence in order to avoid hitting her vehicle. McLendon then drove past the residence for about 200 yards, turned around, and parked facing the residence. It was still daylight when they arrived, weather conditions were normal, and the terrain between the officers and the target residence was level.

Barnes, McAlpin, and McLendon gave inconsistent testimony about who identified the target residence and how. Barnes claimed that he identified the target residence (at 473 Robert Michael Drive) correctly and pointed out the van with the unusual "dualie [sic] axle." McAlpin initially testified that both Barnes and McLendon identified 481 Robert Michael Drive as the target residence, though he later stated that only Barnes did so. McLendon also testified that Barnes identified 481 Robert Michael Drive as the target

4

No. 17-60331

residence as they drove past and that he specifically pointed to a young man standing outside that residence.

The CI entered 473 Robert Michael Drive and bought $600 of methamphetamine. Suddenly, the CI texted Scouten to tell him she was in danger. Scouten broadcast to the other officers that the CI was in danger. He told them to converge on the target residence and do everything they could to help the CI. All vehicles acknowledged the signal—except McLendon's. Barnes testified that he had turned his radio off because McLendon was trying to tune into the radio broadcast from the CI's recording equipment. Scouten specifically requested a response from McLendon's vehicle. Barnes replied that he did not hear the prior transmission, and Scouten repeated it. McAlpin was aware of the second call to go to the target residence, whereas McLendon testified that it never happened.

Meanwhile, Brett Gerhart was standing in front of his house at 481 Robert Michael Drive when he noticed McLendon's black Cadillac Escalade drive by and park at the end of the street. Some time later, he heard McLendon's tires screech as McLendon raced toward the Gerhart residence. McLendon drove onto the Gerharts' yard and parked between some trees. According to Brett, the blue siren lights on McLendon's car were not on, and so there was no indication that it was a police vehicle. As Scouten was rounding the corner, he saw McLendon driving down the street. After Scouten got out of his vehicle, he heard yelling and saw McAlpin, McLendon, and Barnes running across the Gerhart yard and into the house.

Barnes, McAlpin, and McLendon got out of the vehicle and pulled out their weapons. McAlpin told Brett to get on the ground, though it is disputed whether he identified himself as a police officer. All three officers were, however, wearing vests identifying them as police officers. Brett testified that he did not notice the vests until the officers left. When McClendon's vehicle

5

No. 17-60331

came to a stop on the Gerharts' yard, Brett ran into the residence through a side door and locked the door behind him. He went through the residence, shouting, "They have guns!" McAlpin kicked in the side door and started to chase Brett. Brett testified that he then ran through the front door to prevent intruders from coming into the house. According to Brett, McAlpin caught him at the front door, threw him to the ground, and began kicking him in the side and back of the head. McAlpin acknowledges that he pointed his gun at Brett's head but denies kicking him. McAlpin then brought Brett into the living room.

McLendon encountered Joseph Gerhart, Brett's father, when he entered the residence. Joseph was on the floor by that time, and McLendon aimed his gun at Joseph's face. When Joseph tried to get up to help his son, McLendon put his hand on Joseph's back and repeatedly told him to stay down. Barnes was the last to enter the residence, where he encountered Amanda Gerhart in a fetal position, holding a baby in her arms. Amanda testified the she only assumed a fetal position after Barnes pointed his gun at her. After Barnes asked for Amanda's name, he realized that they were in the wrong house. Amanda, however, testified that Barnes never said anything to her. She managed to retreat to her son Ian's room and told him to call 911. Ian made the call and told the operator that there were men with guns in the house.

Barnes found McAlpin in the living room, where he had Brett pinned to the ground. After Barnes told McAlpin that they were in the wrong house, McAlpin got off of Brett and left. McLendon likewise left when he discovered that they were in the wrong house.

While Barnes, McAlpin, and McLendon were inside the Gerhart residence, Scouten and the other officers had converged on the target residence. After Scouten arrived, he initially believed that it would not be possible to get in without breaching tools, and he went to look for McAlpin, who was supposed to bring them to the target residence. He walked toward the

6

No. 17-60331

Gerhart residence and saw McAlpin and McLendon leaving. Someone yelled from the target residence that they had finally managed to break in without the breaching tools, and Scouten returned to the target residence.

Brett suffered injuries to his face and neck, and the city of Pearl ultimately paid for the door that McAlpin destroyed. The Pearl Police Department also conducted an investigation of the incident, which concluded that the officers were inattentive.

Joseph and Amanda filed this lawsuit on their own behalf and on behalf of their children and niece on September 20, 2011.[3] They filed their Fourth Amended Complaint (now the operative complaint in this action) on December 1, 2016. The Gerharts alleged that McLendon[4] was liable under 42 U.S.C. § 1983 for violating their Fourth, Fifth, and Fourteenth Amendment rights by conducting an unreasonable search of their residence and using excessive force against them. They also alleged state-law claims of civil conspiracy, reckless infliction of emotional distress, and negligent infliction of emotional distress. McLendon filed a motion for summary judgment, arguing that he was entitled to qualified immunity on the federal-law claims and that the Mississippi Tort Claims Act barred their state-law claims. The district court held that the Gerharts had abandoned their state-law claims due to their failure to brief them. However, the district court also held that McLendon was not entitled to qualified immunity. Specifically the court found "multiple issues of disputed fact" that suggested that McLendon "did not partake of the simplest precaution of his unconstitutional Fourth Amendment violation of the Gerhart residence." *Gerhart v. Rankin Cnty.*, No. 3:11-CV-586, 2017 WL 1238028, at *12 (S.D.

---

[3] We refer to Plaintiffs–Appellants collectively as "the Gerharts."
[4] Although there are numerous defendants in this litigation, this appeal concerns only McLendon.

7

No. 17-60331

Miss. Mar. 31, 2017). McLendon appeals that decision to this court and asks us to reverse.

## II.

## A.

This case comes to us on appeal from a district court's denial of a motion for summary judgment. Normally, we would review de novo, applying the same standard as the district court. *Kinney v. Weaver*, 367 F.3d 337, 347–48 (5th Cir. 2004) (en banc). A district court must enter summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On appeal, we would ordinarily apply that same Rule 56 standard, and we would reverse the district court's denial of summary judgment if we concluded that the district court found a genuine factual dispute when, on our own review of the record, no such genuine dispute exists." *Kinney*, 367 F.3d at 348.

But there is a wrinkle in our ordinary standard of review. The courts of appeals generally have jurisdiction over only *final* decisions of the district courts. *See* 28 U.S.C. § 1291. "[I]nterlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule." *Johnson v. Jones*, 515 U.S. 304, 309 (1995). The Supreme Court has, however, made one such exception for denials of summary judgment based on qualified immunity. Because qualified immunity is "an *immunity from suit* rather than a mere defense to liability . . . , it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, the Court has held that we have jurisdiction to review a district court's denial of a claim of qualified immunity. *See id.* at 530.

Our review, however, is much more limited than it would ordinarily be. We can review only "the purely legal question whether a given course of conduct would be objectively unreasonable in light of clearly established law."

8

No. 17-60331

*Kinney*, 367 F.3d at 347. This means that we cannot second-guess the district court's determination that genuine factual disputes exist. *See id.* at 348 (citing *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)). Rather, we "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported." *Id.* (citing *Behrens*, 516 U.S. at 313; *Jones*, 515 U.S. at 313). In doing so, we view the facts in the light most favorable to the plaintiff. *See Gonzales v. Dallas Cnty.*, 249 F.3d 406, 411 (5th Cir. 2001) ("[O]n interlocutory appeal the public official must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal." (citing *Berryman v. Rieger*, 150 F.3d 561, 562–63 (6th Cir. 1998))).

## B.

A public official is entitled to qualified immunity unless a plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order for a right to be "clearly established," the relevant legal authorities must give the officer "fair warning" that his or her conduct was unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002). Although the right cannot be defined too abstractly, the Supreme Court has rejected any requirement that the facts of prior cases be "fundamentally" or "materially" similar. *See id.* at 741. Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.*[5] The key question is not whether there is a case directly on point, but whether a

---

[5] *See also Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) ("There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability . . . ." (alteration in original) (quoting *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990))).

9

No. 17-60331

reasonable officer would understand that his or her conduct was unlawful. *See Kinney*, 367 F.3d at 349–50.

## III.

McLendon concedes that the Gerharts have established the first prong of the qualified immunity analysis, but he contends that they cannot establish the second prong for two reasons. First, there is no case that requires an officer who does not plan a search or lead a search team to ensure that the place to be searched is correctly identified. Second, the extreme circumstances under which he mistakenly entered the Gerhart residence tip the reasonableness balance in his favor. We consider (and reject) each of these arguments in turn.

## A.

A warrantless search of a home is presumptively unreasonable, absent probable cause, consent, or exigent circumstances. *See, e.g., United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001) (collecting cases). Nonetheless, no Fourth Amendment violation occurs when officers attempting to perform a valid search mistakenly search the wrong property—as long as they make "a reasonable effort to ascertain and identify the place intended to be searched." *Maryland v. Garrison*, 480 U.S. 79, 88 (1987). Accordingly, "officers are generally granted qualified immunity if the evidence is undisputed that they merely made an honest mistake when entering the incorrect home." *Hunt v. Tomplait*, 301 F. App'x 355, 359 (5th Cir. 2008) (per curiam) (citing *Simmons v. City of Paris*, 378 F.3d 476, 479–80 (5th Cir. 2004)). McLendon concedes that the Gerharts have established the first prong of the qualified immunity analysis, so we can assume that he did not make reasonable efforts to correctly identify the target residence. The question, then, is whether McLendon had fair notice that his efforts fell short of that standard under the second prong.

An unpublished case from this circuit is directly on point. In *Hunt v. Tomplait*, officers were trying to apprehend a suspect who had evaded arrest

10

Case 3:11-cv-00586-HTW-LRA    Document 246    Filed 11/16/17    Page 11 of 15

No. 17-60331

by using deadly force against the officers. *See* 301 F. App'x at 356. Based on information from a cell phone tracking device and a witness, they obtained a warrant for the suspect's father's residence. *See id.* at 356. However, the officers leading the search did not read the warrant and instead assumed that the suspect was at a different property, where they knew that some of his relatives lived. *See id.* at 357. They did not try to determine whether the suspect had any other relatives living nearby, and, as a result, they searched the wrong home. *See id.* at 357–58. We held that the officers leading the search violated clearly established law because there was "no authority to suggest that" the officers' feeble attempts to locate the correct residence "constitute[d] a reasonable effort to ascertain the place to be searched." *Id.* at 361–62.

In reaching that conclusion, we relied on the Eleventh Circuit's published decision in *Hartsfield v. Lemacks*, 50 F.3d 950 (11th Cir. 1995). In that case, the officer leading the search had previously accompanied a CI to the residence named in the warrant. *See id.* at 951. He nonetheless led a team of officers to a different residence nearby. *See id.* at 951–52. Despite his initial efforts to correctly identify the residence, the officer failed to "simply check[] the warrant" to ensure that he was going to the correct address. *Id.* at 955. The Eleventh Circuit concluded that the officer's failure to do so violated clearly established law and that he was not entitled to qualified immunity. *See id.* at 955–56.

The upshot of these cases is that an officer must make reasonable, non-feeble efforts to correctly identify the target of a search—even if those efforts prove unsuccessful. *See Rogers v. Hooper*, 271 F. App'x 431, 435 (5th Cir. 2008). On this record as we are required to view it on appeal, McLendon should have

11

realized that his efforts fell far short of that standard.[6] McLendon testified that he did not attend Scouten's pre-operation briefing. He also denied any knowledge of key details of the plan, including who the CI was, the location of the target residence, and the appearance of the target residence. And McLendon made no affirmative effort to learn those details. Even by his own account, McLendon only learned the location of the target residence when Barnes identified it as they were driving past. Moreover, Barnes, McAlpin, and McLendon dispute whether Barnes correctly identified the target residence. On this record, McLendon made no effort whatsoever—let alone a reasonable one—to correctly identify the place to be searched.

McLendon counters that there is no binding precedent in which this court or the Supreme Court has held that a similarly situated officer acting under similar circumstances violated the Fourth Amendment. The Supreme Court has rejected a rigid requirement that previous cases be "materially similar" in order for the law to be clearly established. *See Hope*, 536 U.S. at 739–41.[7] We need not immunize an officer from suit for an obvious violation simply because no case has held that the officer's precise conduct was unlawful. *See Pierce*, 117 F.3d at 882. The law was clear that McLendon had to make "a reasonable effort to ascertain and identify the place intended to be searched." *Garrison*, 480 U.S. at 88. McLendon is right, of course, that we have not exhaustively and precisely defined the contours of what constitutes a

---

[6] Due to our limited jurisdiction, we cannot review the district court's factual findings. Nor do we have the benefit of the evidence as it will emerge at trial. Thus, our opinion should not be read to preclude dismissing this case on qualified immunity grounds at another point in the proceedings.

[7] McLendon further argues that to the extent that we interpret *Hunt* as supplying the required precedent, it was an unpublished case incapable of clearly establishing the law. This is a misreading of *Hunt*. *Hunt* did not establish the right to be free from a warrantless search based on an unreasonable misidentification of the place to be searched. *Garrison* did. *See* 480 U.S. at 88; *see also Hunt*, 301 F. App'x at 361 (citing *Garrison*, 480 U.S. at 88). *Hunt* merely found that the right was already clearly established. *See* 301 F. App'x at 361–63.

No. 17-60331

"reasonable effort." Whatever the precise contours of that phrase, it surely means that officers must make an effort to be sure they search the right residence in order to receive the protections of qualified immunity. *Compare Rogers*, 271 F. App'x at 435 (holding that officers were entitled to immunity where they "made an initial surveillance of the house" and erred in part because a car initially parked in front of the target house had moved to the front of plaintiffs' house by the time of the search), *with Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986) (holding that officers participating in search were not entitled to qualified immunity because they were "not given an advance briefing" on the search and did not "inquire as to the nature and scope of the warrant"). McLendon's conduct does not fall at the hazy borders of the law. The district court found that he was totally unaware of key operational details and did not even bother to ask. On this record, it appears that he did little more than show up.

McLendon argues that the cases establish only that officers leading a search must make such efforts. We cannot endorse such a confined view of the precedent. To the contrary, although the cases impose heightened obligations on leaders, they make clear that officers who participate in searches still have an obligation to make reasonable efforts to correctly identify the place to be searched. *See Hunt*, 301 F. App'x at 362 n.8 ("What's reasonable for a particular officer depends on his role in the search." (quoting *Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022, 1027 (9th Cir. 2002), *overruled on other grounds by United States v. Grubbs*, 547 U.S. 90 (2006))); *cf. Hartsfield*, 50 F.3d at 956 (holding that officers participating in search were entitled to qualified immunity because "nothing in the record indicate[d] that these officers acted unreasonably in following [the other officer's] lead, or that they knew or should have known that their conduct might result in a [constitutional] violation"). An officer who makes no reasonable effort to correctly identify the place to be

13

Case 3:11-cv-00586-HTW-LRA    Document 246    Filed 11/16/17    Page 14 of 15

No. 17-60331

searched does not get immunity merely because someone else was leading the search.

Accordingly, McLendon violated clearly established law by failing to make any effort to ensure that he could correctly identify the target residence.

## B.

McLendon also argues that the extreme circumstances tip the balance in favor of qualified immunity. If the danger here were unexpected, we might agree. In *White v. Pauly*, for instance, the Supreme Court held that an officer did not violate clearly established law when he used deadly force after arriving on the scene in the middle of a shoot-out between the officers and the plaintiffs. *See* 137 S. Ct. 548, 550, 552 (2017). By contrast, McLendon and the other officers knew or should have known well in advance that the buy-bust operation could become dangerous. Indeed, Scouten held the pre-operation briefing in part to ensure that officers could rescue the CI in an emergency. This is not a case where the emergency was unexpected, even if it was sudden. McLendon had the opportunity to prepare for that eventuality, but he apparently failed to do so. This is what distinguishes McLendon's case from one where the emergency would weigh in the officer's favor: his total failure to prepare. *Cf. Rogers*, 271 F. App'x at 435 ("[B]ecause the search was to occur at night, the chance for a mistake was greater and the need for precautions proportionately were [sic] increased."). McLendon's lack of preparation is all the more unreasonable because he, Barnes, and McAlpin were the officers entrusted with visually monitoring the target residence and responding first in the case of an emergency.

In his reply brief, McLendon makes a related but distinct argument. He argues that he had an objectively reasonable belief that "exigent circumstances" justified a warrantless search of the Gerhart residence. His opening brief does not even mention the exigent circumstances exception to the

14

No. 17-60331

warrant requirement. He contends only that "extreme circumstances" made his mistake of one residence for another reasonable, not that he had an independent and objectively reasonable belief that he could search the Gerhart residence under the exigent circumstances exception to the warrant requirement. By failing to raise the exigent circumstances argument until his reply brief, McLendon has waived it. *See, e.g., Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015).

Even if he had not, we would still reject it. McLendon identifies two facts that supposedly created an objectively reasonable belief that he could enter the Gerharts' home: (1) Brett ran into the house and disobeyed McAlpin's order; and (2) the CI was in danger. The district court found, however, that McLendon had already parked on the Gerharts' lawn *before* Brett started running. He was responding to the CI's distress signal and targeted the Gerhart residence not because Brett ran but because he mistook it for the target residence. The danger facing the CI was undoubtedly an exigent circumstance. But the CI was at the target residence, not the Gerhart residence. McLendon's determination that the danger was inside the Gerhart residence rather than the target residence was not reasonable because, as explained above, he did nothing in advance to make sure he could identify the correct residence, despite having the opportunity to do so.

## IV.

On this record, given our limited standard of review on this interlocutory appeal, we conclude that McLendon is not entitled to qualified immunity as a matter of law. Accordingly, we AFFIRM.